**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Shawn Michael Folta,<br><br>Plaintiff,<br><br>v.<br><br>Dustin Burke; Russel Contreras;<br>Richard Basso; and Michelle Schiavo,<br><br>Defendants. | No. CV 14-01562-PHX-DGC (ESW)<br><br>**ORDER** |

     Plaintiff Shawn Folta, who is represented by counsel, brought this prisoner civil rights action pursuant to 42 U.S.C. § 1983.  Doc. 1.  Defendants are current or former officers of the Arizona Department of Corrections (ADC).  Defendants Russell Contreras, Richard Basso, and Michelle Schiavo move for summary judgment.   (Doc. 192.)  Defendant Dustin Burke, who is separately represented, joins the Motion in part. (Doc. 193.)  Plaintiff moves to strike Burke's Joinder.  (Doc. 200.)  The Motions are fully briefed. (Docs. 211, 229.)  No party has requested oral argument.  For reasons stated below, the Court will grant in part and deny in part the Motion for Summary Judgment and deny as moot the Motion to Strike.

## I.    Background.

     Plaintiff is a prisoner in ADC custody.  He filed this action pro se, claiming violations of his constitutional rights based on his alleged assault in the Arizona State Prison Complex (ASPC)-Eyman in Florence, Arizona.  (Doc. 1.)  Plaintiff alleges that on

April 7, 2014, Correctional Officer (CO) Burke became angry with Plaintiff because Plaintiff quoted policy to him when he failed to give Plaintiff a proper dinner tray. (*Id.* at 3). Burke asked Sergeant Contreras to pull Plaintiff out of his cell, after which Burke restrained Plaintiff's hands behind his back and pulled him into a blind spot in the hallway. (*Id.*) Burke then attacked Plaintiff from behind, pulled him up by his handcuffs, kneed him in the face, threw him head-first into a steel dinner cart, and punched him while he was on the ground. (*Id.*) Contreras and CO Basso helped Burke restrain Plaintiff and take him into an unsupervised area, and both of them witnessed the attack and failed to intervene. (*Id.* at 4-5.) On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated Eighth Amendment claims against Contreras, Basso, and Burke, and directed them to answer the claims. (Doc. 13.) The Court dismissed the remaining claims and Defendants. (*Id.*)

Plaintiff subsequently filed a Motion for Leave to Amend and a proposed First Amended Complaint (FAC), in which he sought to amend Count Three to add claims against CO Schiavo and Deputy Warden Jeffrey Van Winkle, who had been dismissed from the original Complaint. (Docs. 48, 60 at 8.) On screening of the FAC, Magistrate Judge Eileen S. Willet issued a Report and Recommendation ("R&R") in which she found that Plaintiff stated an Eighth Amendment deliberate indifference claim against Schiavo based on his allegations that Schiavo opened Plaintiff's cell door to facilitate his assault, but that Plaintiff failed to state a claim against Van Winkle. (Doc. 85.) The Court accepted the R&R, required Burke, Basso, and Contreras to answer Counts One, Two, and Three, required Schiavo to answer Count Three, and dismissed Van Winkle. (Doc. 104.)

Defendants move for summary judgment based on Plaintiff's failure to exhaust his administrative remedies before filing this action and on the merits of Plaintiff's Eighth Amendment claims.

**II.    Summary Judgment Standard.**

A party seeking summary judgment "bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of [the record] which it

believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is warranted where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

Only disputes over facts that might affect the outcome of the suit will preclude summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The evidence must be viewed in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), and all justifiable inferences are drawn in that party's favor because "[c]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are jury functions," *Anderson*, 477 U.S. at 255.

**III.    Facts.**

The facts are taken from Defendants' Corrected Statement of Facts (Doc. 223-1), Plaintiff's Controverting Statement of Facts (Doc. 211-1), Plaintiff's Corrected Statement of Additional Facts (Doc. 234-1), and the relevant exhibits in the record.[1]    Where the

---

[1] After Plaintiff filed his Response, Defendants filed two Notices of Errata to address citation errors they discovered in their Motion for Summary Judgment and Statement of Facts (Docs. 223, 224), and they attached corrected versions of both their Motion for Summary Judgment and their Statement of Facts (Docs. 223-1, 224-1). After Plaintiff filed an Objection to these corrected filings, arguing that Defendants were required to provide redlined versions to show their changes, Defendants also filed redlined versions of the originals, showing their corrections. (Docs. 231-1, 232-1.) Plaintiff also filed a Notice of Errata in which he identified errors in his Statement of Additional Facts and attached a Corrected Statement of Additional Facts and an additional exhibit, Exhibit P. (Docs. 234, 234-1, 234-2.)    Because neither party argues that they have been prejudiced by these submissions, the Court will cite in this Order to the corrected versions of the parties' filings.

parties' versions of events differ, the Court takes Plaintiff's facts as true. *See Anderson*, 477 U.S. at 255.[2]

### A.    Exhaustion of Administrative Remedies.

ADC Department Order (DO) 802, *Inmate Grievance Procedure*, sets forth the steps inmates must follow to complete the administrative grievance process for medical and non-medical complaints. (Doc. 223-1 ¶ 1.) As the first step to resolving a non-medical issue, an inmate must attempt to resolve the issue informally by discussing it with appropriate staff or by submitting an Inmate Informal Complaint Resolution, Form 802-11. (*Id.* ¶ 4.) If the inmate is unable to resolve the issue with relevant staff through this means, he may submit an Inmate Informal Complaint Resolution to his Unit CO III within 10 workdays of the action that caused the issue. (*Id.* ¶ 5.) The CO III must then investigate and attempt to resolve the issue and provide a response to the inmate within 15 days. (*Id.*)

If the inmate's issue is not resolved informally through these first two steps, the inmate may submit a formal Inmate Grievance to his Unit CO IV Grievance Coordinator within 5 workdays of receiving the CO III's response to his Informal Complaint. (*Id.* ¶ 6.) An inmate may only grieve one issue per grievance form. (*Id.*) Within 15 days following receipt of the Inmate Grievance, the Deputy Warden must issue a written response to the

---

[2] Plaintiff objects to many of Defendants' statements of fact because they contain compound statements and because they rely on affidavit testimony of individuals Defendants were aware Plaintiff had not deposed. (*See* Doc. 211-1.) Neither of these objections is a reason to exclude Defendants' facts. As to the compound statements, Plaintiff does not indicate what parts of those statements, if any, he disputes. Absent more, simply objecting to the grammatical form of a statement is not a reason to reject the asserted facts and evidence. As to the affidavit evidence, Plaintiff does not indicate that he ever requested or attempted to depose any of the affiants and was refused. Absent facts showing that Defendants withheld discovery information from Plaintiff or otherwise acted in bad faith, Plaintiff's lack of knowledge to dispute certain facts is not a reason to prevent Defendants from relying on those facts. Further, where Plaintiff objects to Defendants' facts as being poorly written or inaccurate, Plaintiff largely fails to comply with Federal Rule 56(c)(1), which requires him to indicate which facts are in dispute and to point to the relevant parts of the record to support his contrary assertions of fact. *See* Fed R. Civ. P. 56(c)(1). Absent contrary assertions with references to evidence showing a genuine dispute, the Court will consider Defendants' facts undisputed.

inmate.  (*Id.*)  If the inmate receives an unfavorable response, he may appeal to the Warden within 5 workdays, and the Warden or the Warden's designee has 20 workdays to issue a written response to the inmate.  (*Id.* ¶ 7.)

If the inmate does not receive a favorable resolution to his issue after completing these steps at the unit and institution levels, he may appeal to the Director within 5 days of receiving the Warden's response.  (*Id.* ¶ 8.)  Upon receipt of an appeal to the Director, the Central Office Appeals Officer has 30 calendar days to prepare a response and submit it to the Director or the Director's designee for a signature.  (*Id.* ¶ 9.)  The Director's response is final and ends the administrative grievance process.  (*Id.* ¶ 10.)

If, at any time in the administrative grievance process, an inmate does not receive a response within the appropriate timeframe, he may proceed to the next step in the process the day after the response was due.  (*Id.* ¶ 11.)

The ADC Central Office maintains a computerized log of all non-medical Inmate Grievance Appeals to the Director.  (*Id.* ¶ 12.)  As part of this litigation, Officer Kepney searched this log for any grievances from Plaintiff regarding his allegations against Defendants.  (*Id.*)  Officer Kepney found that Plaintiff had fully grieved one non-medical grievance (Grievance #A30-131-014) against Burke for his alleged April 7, 2014 assault.  (*Id.* ¶ 13; Doc. 191-2 at 28-35.)  Officer Kepney claims that he did not find that Plaintiff had appealed any grievances to the Director's level regarding Contreras, Basso, or Schiavo's alleged actions in connection with the assault.  (Doc. 223-1 ¶ 14; Doc. 191-2 (Kepney Decl.) ¶¶ 20-22.)

**B.  April 7, 2014 Incident.**

On April 7, 2014, Plaintiff and his cellmate were housed in the ASPC-Eyman Special Management Unit, which is a maximum custody unit.  (Doc. 223-1 ¶ 18.) Maximum custody inmates are considered the highest risk to staff and the public, and they are subject to controlled movement within the institution, whereby they are escorted in restraints by either one or two officers, depending on the circumstances.  (*Id.*)  These

inmates also have limited work opportunities, require frequent monitoring, and eat their meals in their cells. (*Id.*)

When two maximum custody inmates are housed together in the same cell, one officer must be present at the cell-front before the trap door may be opened, and two officers must be present at the cell-front before the cell door may be opened. (*Id.* ¶ 20; Doc. 191-5 (Basso Decl.) ¶ 5.) When removing a double-celled maximum custody inmate, the inmate is positively identified, and restraints are applied to both inmates in the cell before opening the cell door. (*Id.*) After both inmates are secured, the officer removing the inmate communicates to the Control Room Officer to unlock the cell door, the cell door is unlocked and opened, and the designated inmate is removed. (*Id.*) The cell door is then closed and locked, and the restraints are removed from the inmate remaining in the cell, while the escort of the removed inmate remains "hands on," meaning the officer maintains the ability to quickly take control of an aggressive or non-compliant inmate by pulling up on the inmate's secured arms, hands, or cuffs. (*Id.* ¶¶ 5-6.) Doing so puts pressure on the inmate's shoulder joints and allows the officer to redirect the inmate to the ground or wall to re-establish control of the inmate. (*Id.* ¶ 6.) This method of responding to an aggressive or non-compliant inmate is standard and accepted procedure within the ADC. (*Id.*)

On April 7, 2014, at approximately 7:08 p.m., Burke and CO Queen began feeding inmates in the unit where Plaintiff and his cellmate were housed. (Doc. 223-1 ¶¶ 18, 32-33.) Burke wrote in a subsequent Use of Force/Incident Command Report[3] that he gave Plaintiff his dinner tray, and Plaintiff became irate about the portion of broccoli, yelled

---

[3] In his Corrected Statement of Additional Facts (Doc. 234-1), Plaintiff frequently relies on the contents of ADC Incident Reports. Where, as here, Plaintiff cites to Defendant Burke's statements in these reports, the Court will consider this evidence as the testimony of an opposing party pursuant to Federal Rule of Evidence 801(2). Where Plaintiff relies on other second-hand statements, including his own statements in these reports as well those of other inmates, the Court will include this evidence because Plaintiff may be able to present it in a form admissible at trial. Material in a form not admissible in evidence, but which could be produced in a form admissible at trial, may be used to *avoid*, but not *obtain* summary judgment. *See Quanta Indemnity Co. v. Amberwood Dev. Inc.*, No. CV 11-1807-PHX-JAT, 2014 WL 1246144, at *2 (D. Ariz. March 26, 2014) (citing cases).

profanities, threatened to go on a hunger strike, became even more irate when Burke replied that he was not responsible for preparing the food trays but only for delivering them, and asked to speak to a sergeant. (Doc. 234-1 (Pl. Statement of Additional Facts) ¶ 7; Doc. 191-4 at 14.)

After the inmate kitchen workers were returned to their cells or taken to the showers, Burke went to Contreras's office, located in the yard office where all the supervisors' offices were located, and informed Contreras that Plaintiff was upset about a food portion, had threatened to go on a hunger strike, and had asked to speak to a supervisor. (Doc. 223-1 ¶¶ 34, 36-37.)

Contreras thought it would be prudent to remove Plaintiff from his cell so he could talk to Plaintiff one-on-one to resolve the situation and/or find out the reason for the hunger strike. (*Id.* ¶¶ 37; Doc. 191-4 (Contreras Decl.) ¶ 10.) Contreras opines that removing an inmate from the presence of other inmates to resolve an issue prevents other inmates from overhearing, interjecting, or interfering, and it facilitates resolution to have the inmate away from the pressure to perform a certain way in front of other inmates. (Contreras Decl. ¶ 10.) Consequently, Contreras advised Burke to take Plaintiff to the west yard holding cell so he could talk to Plaintiff there. (*Id.* ¶ 9.)

Contreras was aware that Plaintiff had engaged in a hunger strike the week before, and he intended to interview Plaintiff, take him to medical to obtain his vitals, and place him on hunger strike status. (*Id.* ¶ 9.)[4] As a matter of practice, Contreras asked Burke if the issue was personal between him and Plaintiff, and Burke purportedly replied, "No, he's just upset about the food portion." (*Id.* ¶ 8.)

---

[4] The "OIG Report" that Defendant Contreras cites in his declaration regarding Plaintiff's prior hunger strike does not appear to be in evidence. (*See* Contreras Decl. ¶ 9.) The Court therefore includes Contreras's declaration testimony regarding what he was aware of solely to show Contreras' belief and state of mind, not as evidence that Plaintiff was or had been on a hunger strike, which Plaintiff disputes.

Following Contreras's directive, Burke proceeded back to Plaintiff's cell. (Doc. 223-1 ¶ 41.) At some point, while Burke was away, Basso asked Plaintiff: "What's up with you and Burke? Why is he so pissed?" (Doc. 234-1 ¶ 11; Doc. 192-2, Ex. B at 59-60 (Pl. Dep. at 74:19-75:6).) Another inmate returning from the kitchen also yelled to Plaintiff that Burke and Contreras were in the hallway discussing a plan to assault Plaintiff and they were going to pull him out of his cell and "f*** him up." (*see* Doc. 234-1 ¶ 10; Doc. 192-2, Ex. B at 8-9 (Pl. Dep. at 23:9-24:23)).

After Burke returned, Basso was in Plaintiff's unit returning inmate workers to their cells, and he heard Burke tell Plaintiff that Contreras wanted to talk to him. (Doc. 223-1 ¶ 41.) Pursuant to regular practice for opening the cell doors of double-celled, maximum custody inmates, Burke and Basso were both present, and they secured both Plaintiff and his cellmate before signaling Schiavo, the Control Room Officer, to open Plaintiff's cell door, which she did. (*Id.* ¶ 42.) At approximately 7:30 p.m., Burke removed Plaintiff from his cell, Schiavo relocked Plaintiff's cell door, and Burke escorted Plaintiff out of the pod. (*Id.*)

As the Control Room Officer, Schiavo locks and unlocks doors at the request of officers and staff, and, apart from specific circumstances such as showers and recreation, she generally does not know the reason an inmate is being removed from a cell or where he is being taken. (*Id.* ¶ 46.) Schiavo was unaware of the reason for removing Plaintiff from his cell, had no knowledge of Plaintiff's complaint about his food, and had no reason to believe an incident had occurred between Burke and Plaintiff. (*Id.* ¶ 47.) At the time she unlocked and relocked Plaintiff's cell door, she was busy doing the same for cell and pod doors of inmate workers returning from the kitchen. (*Id.*) From her position in the Control Room, Schiavo can see down the "runs" of the pods where prisoners are held, but she cannot see into individual cells. (Doc. 211-14 (Schiavo Decl.) ¶ 9.)

After Burke escorted Plaintiff out, Basso started to return to his posted position by way of the hallway leading to and intersecting with the corridor where Burke had gone with Plaintiff. (*Id.* ¶¶ 42, 43.) As Basso turned the corner into the corridor, he allegedly

turned his back on Burke, who was escorting Plaintiff in the opposite direction in a hands-on escort, meaning with his hand on Plaintiff's arm. (*Id.* ¶ 43.)

Shortly after this, Basso claims that he heard shoes shuffling and Burke say, "stop resisting." (*Id.* ¶ 44.) He purportedly turned around and saw Burke redirecting Plaintiff to the floor and activating the incident command system (ICS). (*Id.*) Basso claims that he saw Plaintiff go directly to the floor, but did not see Plaintiff hit a wall or Burke throw, knee, punch, or strike Plaintiff in any way. (Doc. 191-5 (Basso Decl.) ¶ 16.)

Upon hearing the ICS, Basso states that he immediately responded to Burke's location and held Plaintiff down while CO Digiro applied lower restraints. (Doc. 223-1 ¶ 44; Basso Decl. ¶ 14.)[5] Plaintiff was face-down but was attempting to turn over, and Basso ordered him to turn back onto his stomach. (Basso Decl. ¶ 14.) Plaintiff purportedly told Defendant Basso, "I'm fine just re-house me." (*Id.*)

In addition to Basso and Digiro, Contreras and COs Queen, Mwangi, and Sgt. Werfelman also responded to the ICS. (Doc. 223-1 ¶ 50.) Digiro and Contreras relieved Burke, and Contreras took command of the ICS. (*Id.* ¶¶ 50, 54.) After Digiro applied lower restraints to Plaintiff, he and Contreras lifted Plaintiff up and secured him on a gurney. (*Id.* ¶ 50.) Contreras and Sgt. Werfelman then escorted Plaintiff to the Health Unit, where he was examined and treated for a cut over his right eyebrow, which was closed with two butterfly sutures by a nurse. (*Id.* ¶ 55.) The next day, Plaintiff reported to medical, and the medical notes indicate that his left shoulder appeared swollen, his left knee was scraped, and he had a "very swollen area" of the right flank with limited range of motion, especially when bending. (Doc. 234-2.)

When Contreras relieved Burke, he instructed him to report to the Health Unit because he had sustained injuries. (*Id.* ¶ 54.) Burke was evaluated for bruising on the top

---

[5] Basso testifies confusingly that he "immediately responded to Officer Burke's location and held inmate Folta down along with Digiro and removed Burke from the incident location." (Basso Decl. ¶ 14.) This testimony is too vague and unclear as to what was happening and what Basso did to "remove" Burke from the location to give a useful account of these actions.

of his right hand and redness on the right side of his jaw.  (*Id.*)  He was taken to Florence Anthem Hospital for further medical evaluation.  (*Id.*)

At approximately 7:56 p.m., Contreras contacted Criminal Investigations Unit (CIU) Investigator Bill Dziadura, who took photographs of the scene and of Burke and Plaintiff.  (*Id.* ¶ 57.)  Burke told Contreras that Plaintiff's actions were spontaneous, and Plaintiff had not exhibited any aggressive behavior as he was being restrained and removed from his cell.  (*Id.* ¶ 61.)[6]  According to Plaintiff, no part of Plaintiff's body hit or touched Defendant Burke at any time, and he did not fight back during the assault.  (Doc. 231-1 ¶ 35; Doc. 192-2 at 58-59 (Pl. Dep. at 43:22-44:23).)

Plaintiff received a disciplinary ticket for the incident, but the charges against him were dismissed on August 25, 2014 because Criminal Investigator Kathy Ingulli found no evidence to corroborate Plaintiff or Burke's version of events.  She also found that Burke's story was not believable.  (Doc. 211-3 at 1-2.)  Ingulli also interviewed Schiavo and Basso, who were later found to be not forthcoming.  (*Id.* at 2.)   Ingulli also investigated another staff-inmate assault involving Burke, Basso, and Schiavo on June 30, 2014, after Plaintiff's alleged assault.  (Doc. 211-16 at 2.)  During questioning about that incident, Schiavo was initially evasive about her knowledge and involvement in it, but after being presented with her own cell-phone messages about the incident, she admitted to opening the inmate's cell door, allowing several officers – including Basso and Burke – to enter the cell and assault the inmate.  (Doc. 211-16 at 2-3, 6, 9-10.)  As a result of Ingulli's findings in this investigation, Burke, Basso, and Schiavo's employment with ADC was terminated.  (*Id.* at 8.)

---

[6] Defendants do not put forth any facts about what these "spontaneous" actions of Plaintiff were or any other evidence as to what prompted Defendant Burke to take Plaintiff down.

**IV. Discussion.**

    **A. Exhaustion.**

Under the Prison Litigation Reform Act (PLRA), a prisoner must exhaust "available" administrative remedies before filing an action in federal court. 42 U.S.C. § 1997e(a); *see Vaden v. Summerhill*, 449 F.3d 1047, 1050 (9th Cir. 2006); *Brown v. Valoff*, 422 F.3d 926, 934-35 (9th Cir. 2005). The prisoner must complete the administrative review process in accordance with the applicable rules. *See Woodford v. Ngo*, 548 U.S. 81, 92 (2006). Exhaustion is required for all suits about prison life, *Porter v. Nussle*, 534 U.S. 516, 523 (2002), regardless of the type of relief offered through the administrative process, *Booth v. Churner*, 532 U.S. 731, 741 (2001).

The defendant bears the initial burden to show that there was an available administrative remedy and that the prisoner did not exhaust it. *Albino v. Baca*, 747 F.3d 1162, 1169, 1172 (9th Cir. 2014); *see Brown*, 422 F.3d at 936-37 (a defendant must demonstrate that applicable relief remained available in the grievance process). Once that showing is made, the burden shifts to the prisoner, who must either demonstrate that he exhausted administrative remedies or come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him. *Albino*, 747 F.3d at 1172. The ultimate burden, however, rests with the defendant. *Id.* Summary judgment is appropriate if the undisputed evidence, viewed in the light most favorable to the prisoner, shows a failure to exhaust. *Id.* at 1166, 1168; *see* Fed. R. Civ. P. 56(a).

If the defendants move for summary judgment for failure to exhaust and the evidence shows that the plaintiff did, in fact, exhaust all available administrative remedies, it is appropriate for the court to grant summary judgment sua sponte for the nonmovant on the issue. *See Albino*, 747 F.3d at 1176 (pro se prisoner did not cross-move for summary judgment on issue of exhaustion, but because he would have succeeded had he made such a motion, sua sponte grant of summary judgment was appropriate).

Defendants argue that Plaintiff failed to exhaust his administrative remedies on his claims against them because his grievance records show only that he completed the grievance process with respect to Burke's alleged assault, and he did not grieve his alleged claims against Contreras, Basso, and Schiavo. (Doc. 224-1 at 9.)

Plaintiff argues in his Response that, because it is undisputed that he completed the grievance process regarding his assault, he exhausted his administrative remedies for all claims stemming from that assault, and he was not required to name each of the prospective Defendants involved in that incident before filing this lawsuit. (Doc. 211 at 11.) Plaintiff relies on *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009), in which the Ninth Circuit addressed the level of specificity inmates are required to include in their grievances for proper exhaustion. *Griffin* adopted the standard that "when a prison's grievance procedures are silent or incomplete as to factual specificity, 'a grievance suffices [for exhaustion purposes] if it alerts the prison to the nature of the wrong for which redress is sought.'" *Id.* (quoting *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002)). The Ninth Circuit reasoned that this standard "advances the primary purpose of a grievance: to notify the prison of a problem." *Griffin*, 557 F.3d at 1120.

A review of Plaintiff's grievances shows that, in his Informal Complaint Resolution, Plaintiff wrote that he was "informally trying to resolve the issue of being assaulted by CO II Burke on 4-7-14" and that his resolution was "for CO II Burke to be fired, and for retaliation to stop against me for reporting him." (Doc. 191-2 at 35.) Later, in Plaintiff's formal Inmate Grievance ("Grievance #A30-131-014"), Plaintiff additionally stated that he was "assaulted by CO II Burke, and Sgt. Contreras let him pull me out to do it." (*Id.* at 33.)

At a minimum, therefore, Grievance #A30-131-014 would have put prison staff on notice that both Burke and Contreras were involved in the alleged assault. Defendants' non-exhaustion defense as to Contreras is therefore unfounded. Additionally, as to Schiavo and Basso, Defendants do not point to any requirement in ADC's grievance policies that prisoners must identify each prison official involved in an incident to satisfy the grievance

process; nor do the grievance forms Plaintiff submitted in this action contain such a requirement. (*See* Doc. 211-3 at 16, 18.) Absent any such directives, Plaintiff was not required to identify each person he later named as a Defendant, so long as he provided enough facts "to put prison staff on notice to investigate a particular harm and take corrective action." *Griffin*, 557 F.3d at 1120; *see Jones v. Bock*, 549 U.S. 199, 219 (2007) (explaining that "exhaustion is not *per se* inadequate simply because an individual later sued was not named in the grievances"); *Butler v. Adams*, 397 F.3d 1181, 1183 (9th Cir. 2005) (finding that the plaintiff satisfied the PLRA's exhaustion requirement where he described the problem and "[t]he form did not require identification of any specific persons"); *McCoy v. L.A. Cty. Sheriff's Dep't*, No. CV 09-0093-GHK DTB, 2010 WL 330235, at *6 (C.D. Cal. Jan. 18, 2010) ("Plaintiff is not required to name specific individuals or to set forth all the facts relevant to each of his claims, as long as his inmate grievance is adequate to provide officials with notice of the alleged harm.") (citing *Jones*, 549 U.S. at 218; *Butler*, 397 F.3d at 1183).

In this case, identifying the alleged April 7, 2014 assault in Grievance #A30-131-014 was sufficient "to notify the prison of a problem" (i.e., the assault) and enable them to investigate and attempt to rectify the harm – including any possible misconduct of Basso and Schiavo, who were not specifically named in that Grievance. *See Griffin*, 557 F.3d at 11120. Tellingly, in ADC's criminal investigation of the same incident, Ingulli conducted interviews with and/or identified relevant actions of all Defendants in this action, including Basso and Schiavo. (*See* Docs. 211-12, 211-15.) Plaintiff's complaint about the assault in Grievance #A30-131-014 was therefore sufficient to put ADC staff on notice of the possible misconduct of these Defendants, and his undisputed pursuit of this grievance to the Director's level satisfies the exhaustion requirement as to Plaintiff's Eighth Amendment claims against all Defendants. Accordingly, the Court will grant

summary judgment to Plaintiff on exhaustion and will deny Defendants' Motion for Summary Judgment in this respect.  *See Albino*, 747 F.3d at 1176.[7]

### B.    The Merits.

Defendants make a number of overlapping First and Eighth Amendment-based arguments in their Motion for Summary Judgment, many of which are not relevant to the merits of Plaintiff's claims against Contreras, Schiavo, and Basso.

For instance, Defendants devote much of their Motion to First Amendment retaliation arguments (*see* Doc. 224-1 at 10, 14-18), when the Court found that Plaintiff stated only Eighth Amendment claims against Burke, Basso, and Contreras in the original Complaint (*see* Doc. 13 at 5), and he restated these claims and made an additional Eighth Amendment deliberate indifference claim against Schiavo in the FAC.  (Docs. 85, 104.)

Defendants' Eighth Amendment-based arguments also miss the mark because they simply argue that there is no evidence Contreras, Schiavo, and Basso took part in the assault, therefore Plaintiff cannot show they used excessive force against him.  (Doc. 224-1 at 13:19-21, 14:13-15, 14:25-26, 15:20-21.)  But the sole use of physical force alleged in the pleadings and noted by the Court on screening is Burke's alleged assault on Plaintiff.  (*See* Docs. 1 & 60 at 3-5; Doc. 13 at 3-4.)

Plaintiff's claims against Defendants, on the other hand, are based on his allegations that Contreras and Basso brought Plaintiff to the hallway where Burke attacked him, they failed to intervene or otherwise stop the attack (*see* Doc. 13 at 4), and Defendant Schiavo opened Plaintiff's cell door knowing that an assault would occur (*see* Doc. 85 at 6).  These claims are not based on excessive-use-of-force, but on deliberate indifference to a substantial threat to Plaintiff's safety or failure to protect, which Defendants do not specifically discuss in their Motion.

---

[7] To the extent Defendants claim that Plaintiff failed to exhaust as to each separate legal theory presented in the FAC, this argument is unavailing because "[a] grievance need not include legal terminology or legal theories unless they are in some way needed to provide notice of the harm being grieved."  *Griffin*, 557 F.3d at 1120

Because Defendants have produced relevant evidence bearing on the threat to safety claims in their Statement of Facts and in scattered places throughout Motion, to which Plaintiff has responded on the merits, and because Defendants have addressed the relevant legal standard in their Reply (*see* Doc. 229 at 7-8), the Court will address whether they have met their initial burden on summary judgment as to Plaintiff's Eighth Amendment threat to safety claims.

### 1.    Legal Standard.

To state a claim for threat to safety, an inmate must allege facts to support that he was incarcerated under conditions posing a substantial risk of harm and that prison officials were "deliberately indifferent" to those risks. *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994). To adequately allege deliberate indifference, a plaintiff must allege facts to support that a defendant knew of, but disregarded, an excessive risk to inmate safety. *Id*. at 837. As to the knowledge component, "the official must both [have been] aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and he must also [have] draw[n] the inference." *Id*. Thus, Plaintiff must allege facts to support when and how any particular Defendant knew of a substantial risk of harm to Plaintiff and that the Defendant disregarded or failed to take steps to protect Plaintiff.

### 2.    Defendant Contreras.

Defendants argue that Plaintiff's Eighth Amendment claim against Contreras fails because there is no evidence Contreras knew of and deliberately disregarded an excessive risk of harm to Plaintiff. (Docs. 224 at 1, 229 at 10.) Rather, Defendants' evidence shows that Contreras was not advised of any verbal confrontation between Burke and Plaintiff prior to his directing Defendant Burke to escort Plaintiff from his cell. (Doc. 223-1 ¶ 57.) Additionally, when he specifically asked Burke as a matter of practice whether there was anything personal between Burke and Plaintiff, Burke replied, "No, he's just upset about the food portion." (*Id.* ¶ 38.)

Although this evidence is sufficient to meet Defendants' initial burden of showing that Contreras was not aware of the risk of harm to Plaintiff prior to the assault, the record

contains sufficient evidence to create a material dispute of fact that Contreras knew about Burke's verbal dispute with Plaintiff and had reason to believe Burke would harm Plaintiff before he ordered Burke to escort Plaintiff out of his cell. Based on Burke's account in his Use of Force/Incident Command Report, when Burke delivered Plaintiff's his dinner tray, Plaintiff "became irate" about the portion of broccoli, yelled profanities toward Burke, threatened a hunger strike, and became "even more irate" and asked to speak to a sergeant when Burke told him "I don't make the trays I just deliver them." (Doc. 211-9 at 2.) Burke then "exited the cluster to brief Sgt. Contreras." (*Id.*) Additionally, while Burke was away, Basso asked Plaintiff, "What's up with you and Burke? Why is he so pissed?" (Doc. 234-1 ¶ 11; Doc. 192-2 at 59:19-60:6.) Taken together, this evidence suggests that Burke became angry with Plaintiff during the verbal confrontation over the dinner tray, and he conveyed this to Contreras when he reported the incident to him. From these facts, a jury reasonably could infer that Contreras knew that ordering Burke to remove Plaintiff from his cell at that time would likely lead to a violent encounter and subject Plaintiff to a substantial threat of serious harm, but Contreras ignored and thereby acted with deliberate indifference to this threat.

In addition to this evidence, Plaintiff presents evidence that, prior to the assault, another inmate yelled to him that Contreras and Burke were "planning the assault in the hallway outside Plaintiff's unit." (Doc. 234-1 ¶ 10) Even though this evidence conflicts with Defendants' evidence that Burke only spoke to Contreras in the yard office out of hearing of any inmates, a reasonable jury presented with this evidence could believe Plaintiff's version of events and find in Plaintiff's favor that Contreras intentionally plotted and helped instigate the assault on Plaintiff in violation of Plaintiff's Eighth Amendment rights. Accordingly, the Court will deny Defendants' Motion for Summary Judgment on the merits as to Defendant Contreras.

### 3.     Defendant Basso.

Defendants argue that Basso only assisted Burke in removing Plaintiff from his cell and was unaware of the dispute about the meal tray between Burke and Plaintiff; therefore,

Plaintiff cannot show that Basso ignored or was deliberately indifferent to a substantial threat to Plaintiff's safety when Burke escorted Plaintiff from his cell. (Doc. 224-1 at 19; Doc. 229 at 9, 10.) Defendants also argue that even if Basso knew about the argument, this is insufficient to show Burke intended to harm Plaintiff or that Basso inferred that Burke would do so, and, even if he did, there is no evidence Basso could have intervened when the assault occurred. (Doc. 229 at 10.)

Defendants' argument that there is no evidence Basso knew about the verbal altercation between Plaintiff and Burke is unavailing because, taking Plaintiff's facts as true, Basso specifically asked Plaintiff prior to the assault what was going on between Burke and Plaintiff and why Burke was "so pissed." (Doc. 234-1 ¶ 11; Doc. 192-2 at 59-60 (Pl. Dep. at 74:19-75:6).) A reasonable jury could infer from these facts that Basso was aware when he helped Burke remove Plaintiff from his cell and watched Burke lead Plaintiff down the hallway to the connecting corridor that Burke was likely to harm Plaintiff, and Burke acted in deliberate disregard to this risk. Coupled with this, the additional evidence in the record showing that Burke and Basso were jointly-involved in a subsequent inmate assault under similar circumstances could lead a reasonable jury to conclude that Defendant Basso was untruthful when he claimed to have no awareness of any risk of harm to Plaintiff in this instance.[8] Accordingly, questions of fact regarding Basso's knowledge and intent prior to the assault prevent the Court from concluding that Basso did not act with deliberate indifference to a substantial threat of serious harm to Plaintiff when he helped Burke remove Plaintiff from his cell, and the Court will deny summary judgment on the merits to Basso.

### 4. Defendant Schiavo.

Defendants argue that, as the Control Room Officer, Schiavo was only involved in opening and closing cell doors as requested by officers and staff, and when she unlocked

---

[8] Defendants make no argument that the evidence regarding the subsequent inmate assault is inadmissible under Federal Rule of Evidence 404(b), and the Court cannot conclude at this juncture that this evidence would be inadmissible at trial, at least to question Basso's credibility as to his testimony in this action.

Plaintiff's cell door, "she had no reason to believe that there would be an incident between Officer Burke and [Plaintiff]." (Doc. 224-1 at 20.)

Plaintiff fails to present any controverting evidence to show that Schiavo was aware of the altercation over the food tray between Burke and Plaintiff or that she had any communication with Burke, Contreras, or Basso prior to opening Plaintiff's cell door from which she could have, and did, infer that doing so would lead to Plaintiff being harmed. Plaintiff argues that Schiavo could see and hear the verbal altercation over the food tray "because it occurred only a few feet away from her post," but the evidence he cites does not indicate where Schiavo's post was in relation to Plaintiff's cell or support that she could see or hear activity outside Plaintiff's cell from her position in the Control Room. (*See* Doc. 211 at 12; Doc. 211-14 (Schiavo Decl.) ¶ 9).) Plaintiff also speculates that Schiavo's facilitation in the later inmate assault shows she acted "maliciously and sadistically to cause harm" in this instance. (Doc. 211 at 12.) But absent any evidence that Schiavo knew of Burke's argument with Plaintiff or had any communication with Burke, Contreras, or Basso about Plaintiff prior to unlocking Plaintiff's cell door, this evidence is insufficient to create a genuine issue of material fact that Schiavo had the requisite knowledge and malicious intent to harm Plaintiff. Even if a reasonable jury could conclude from Schiavo's duplicity in the investigation of the other incident that her testimony about what happened in this case is not credible, Plaintiff still bears the ultimate burden of showing Schiavo was aware of facts from which she both could have, and did, infer a substantial risk of serious harm to Plaintiff and she acted with deliberate indifference to that risk. Merely questioning Schiavo's credibility without producing any affirmative evidence from which to draw this conclusion is insufficient for a reasonable jury to find in Plaintiff's favor that Schiavo violated Plaintiff's Eighth Amendment rights. Accordingly, the Court will grant Defendants' Motion for Summary Judgment as to Schiavo.

## C. Qualified Immunity.

Defendants argue that they are entitled to qualified immunity on Plaintiff's claims because they reasonably could have believed that their actions toward Plaintiff were

reasonable for officers in their position. (Doc. 224-1 at 18-19.) Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In deciding if qualified immunity applies, the Court must determine: (1) whether the facts alleged show the defendant's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 230-32, 235-36 (2009) (courts may address either prong first depending on the circumstances in the particular case).

Here, the Court has already determined that disputed facts, viewed in the light most favorable to Plaintiff, create triable issues as to whether Contreras and Basso's conduct violated Plaintiff's Eighth Amendment rights. Thus, the qualified immunity analysis turns on whether Defendants' conduct, viewed in the light most favorable to Plaintiff, violated clearly established law. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). This inquiry turns on the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Pearson*, 129 S. Ct. at 822 (quotation omitted). If a government official "could . . . have reasonably but mistakenly believed that his conduct did not violate a clearly established constitutional right," he is entitled to qualified immunity. *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001).

Defendants argue that Contreras and Basso are entitled to qualified immunity because it was not clearly established at the time that moving an inmate from one location to another to resolve a dispute, placing an inmate in restraints, or allowing an officer to escort an inmate violates the inmate's constitutional rights. (Docs. 224-1 at 19-20, 229 at 11). These arguments have no weight because they are based entirely on Defendants' sanitized version of disputed facts. Accepting Plaintiff's version of the facts as true, Contreras and Basso would have known that removing Plaintiff from his cell either to facilitate his assault by another prison official, or at the very least, in deliberate disregard to a serious risk that such an assault would occur, violated Plaintiff's constitutional rights. Accordingly, Contreras and Basso are not entitled to qualified immunity on Plaintiff's

Eighth Amendment threat to safety claims.

**V.    Plaintiff's Motion to Strike.**

In his Motion to Strike, Plaintiff argues that Burke's Joinder in the Motion for Summary Judgment should be stricken as untimely.  (Doc. 200 at 1.)  This is because, he argues, the Motion was filed on August 24, 2018, the last day of the Court's extended deadline for filing dispositive motions, and Burke neither joined any of the motions seeking extensions to the prior filing deadlines; nor did he adhere to the extended filing date.  (*Id.* at 2.)  Instead, Burke only filed his Joinder on August 27, 2018, three days after the extended deadline for dispositive motions had already passed.  (*Id.*)

The Court will deny the Motion to Strike as moot.  First, it appears from Burke's arguments in his Joinder that he only intended to join in the exhaustion defense.  (*See* Doc. 193 at 2-3.)  Because it is clear from the evidence that Plaintiff properly exhausted his administrative remedies as to his claims against Burke, these claims must be resolved on the merits, regardless of whether Burke is permitted to join the Motion for Summary Judgement.  Second, even if Burke intended to join the Motion on the merits, the other Defendants provide no evidence about Burke's use of force, including what prompted the use of force and what Plaintiff was doing at the time from which to make an initial showing that the force Burke used was reasonable under the circumstances.  Accordingly, permitting Burke to join the Motion for Summary Judgment has no bearing on the outcome of Plaintiff's claims against him, thereby rendering Plaintiff's Motion to Strike moot.

**IT IS ORDERED:**

(1)    The reference to the Magistrate Judge is **withdrawn** as to the Motion for Summary Judgment (Doc. 192) and Plaintiff's Motion to Strike Defendant Burke's Joinder (Doc. 200).

(2)    The Motion for Summary Judgment (Doc. 192) is **granted** as to Defendant Schiavo and **denied** as to Defendants Basso and Contreras.

(3)    Plaintiff's Motion to Strike (Doc. 200) is **denied as moot**.

(4)     The remaining claims in this action are Plaintiff's Eighth Amendment claims against Defendants Burke, Basso, and Contreras.

(5)     This action is referred to Magistrate Judge Deborah M. Fine to conduct a settlement conference.

(6)     Counsel shall arrange for the relevant parties to jointly call Magistrate Judge Fine's chambers within 14 days of the date of this Order to schedule a date for the settlement conference.

Dated this 29th day of March, 2019.

David G. Campbell
Senior United States District Judge